## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF FLORIDA
## GAINESVILLE DIVISION

**JOE W. LITTLES,**

     **Plaintiff,**

**vs.**                    **Case No.  1:17cv192-MW/CAS**

**NANCY A. BERRYHILL, Acting**
**Commissioner of Social**
**Security,**

     **Defendant.**

_____/

## REPORT AND RECOMMENDATION

This is a Social Security case referred to the undersigned magistrate judge for a report and recommendation pursuant to 28 U.S.C. § 636(b) and Local Rule 72.2(D).  It is now before the Court pursuant to 42 U.S.C. § 405(g) for review of the final determination of the Acting Commissioner (Commissioner) of the Social Security Administration (SSA) denying Plaintiff's application for Supplemental Security Income (SSI) filed pursuant to Title XVI of the Act and an application for a period of disability and Disability Income Benefits (DIB) filed pursuant to Title II of the Social Security Act.  After consideration of the entire record, it is recommended that the decision of the Commissioner be affirmed.

## I. Procedural History

On December 29, 2013, and February 11, 2014, Plaintiff, Joe W. Littles, filed applications for SSI and a period of disability and DIB, respectively, alleging disability beginning December 29, 2013, based on injury with low back pain, bilateral lower extremity, and carpel tunnel. Tr. 32, 196-204, 230; *see* Tr. 273, 280 (additional reasons for disability, including eye injury).[1]  Plaintiff last met the insured status requirements for DIB on March 31, 2014.[2]  Tr. 33, 226, 271, 278.

Plaintiff's applications were denied initially on April 4, 2014, and upon reconsideration on September 16, 2014.  Tr. 32, 94-131, 140-49.  On October 23, 2014, Plaintiff requested a hearing.  Tr. 32, 150-51.  On February 23, 2016, Plaintiff's counsel submitted a memorandum of law which was considered by the ALJ.  Tr. 32, 310-14 (Exhibit 18E).  The hearing was held on March 1, 2016, in St. Petersburg, Florida, before Administrative Law Judge (ALJ) Elving L. Torres.  Tr. 32, 60-93.  Plaintiff

---

[1]  Citations to the transcript/administrative record, ECF No. 10, shall be by the symbol "Tr." followed by a page number that appears in the lower right corner.

[2]  To be eligible for DIB, a claimant must establish a disability prior to the expiration of his insured status, here, March 31, 2014.  Tr. 34, 271, 278; *see* Moore v. Barnhart, 405 F. 3d 1208, 1211 (11th Cir. 2005).  For SSI claims, the relevant period is the month in which Plaintiff filed her SSI application, here December 29, 2013, through the date of the ALJ's decision, May 11, 2016.  *See* 20 C.F.R. § 416.501; Moore, 405 F.3d at 1211.

was represented by Nancy L. Cavey, an attorney.  Tr. 32, 60, 132-33, 156.

(Ms. Cavey withdrew from representation on June 10, 2016.  Tr. 28.)

Plaintiff testified during the hearing.  Tr. 63-88.  David Heaston, Ed.D., an

impartial vocational expert, testified during the hearing.  Tr. 32, 88-91, 305-

09 (Resume).  Toward the end of the hearing, Plaintiff's counsel advised

the ALJ that she had an RFC form outstanding at Community Health

Center (Community) which she would like to present to the ALJ and that

Plaintiff had an appointment at Behavioral Medical Center (Behavioral) on

March 18 and would also like to submit information from that appointment.

Tr. 91-92; *see* Tr. 87.  The ALJ agreed to leave the record open until March

25, 2016.  Tr. 92.

After the hearing, Plaintiff submitted Exhibit 10F consisting of medical

evidence (two pages) from Community from March 4, 2016.  Tr. 46, 414-

15.  On March 4, 2016, Plaintiff was examined at Community by Nicole

Millar, LCSW, with the encounter stating: "Behavior Health New."

Tr. 414-15.  The record does not include an RFC form from Community.

*Id.*; *see* ECF No. 10-1 (Exhibit 10F).  There are no records from Behavioral.

*See* ECF No. 10-1.

On May 11, 2016, the ALJ issued an unfavorable decision and

determined that Plaintiff was not disabled from December 29, 2013,

through May 11, 2016, the date of the ALJ's decision.[3]  Tr. 32-41.  On July

11, 2016, Plaintiff's current counsel, Tr. 25-27, 58-59, requested review of

the ALJ's decision.  Tr. 1, 4-5, 193-95 (Exhibit 19B).  On September 7,

2016, the Appeals Council granted Plaintiff's request for more time to

submit more evidence.  Tr. 10, 17.  On May 25, 2017, the Appeals Council

denied Plaintiff's request for review, making the ALJ's decision the final

decision of the Commissioner.  Tr. 1-6; *see* 20 C.F.R. § 404.981.

On July 23, 2017, Plaintiff, by counsel, filed a Complaint with this

Court seeking review of the decisions rendered by the ALJ.  ECF No. 1.

The parties filed memoranda of law, ECF Nos. 16 and 17, which have been

considered.

## II.  Findings of the ALJ

The ALJ made several findings:

1.  The claimant meets the insured status requirements of the Social
    Security Act through March 31, 2014. Tr. 35.

2.  The claimant has not engaged in substantial gainful activity since
    December 29, 2013, the alleged onset date.  *Id.*

---

[3]  The ALJ noted that Plaintiff previously filed a Title II application, which was denied January 30, 2014, and that the current alleged onset date of December 29, 2013, falls within a period of prior adjudication and subject to administrative finality or res judicata because Plaintiff did not pursue reconsideration within the allotted timeframe.  Tr. 32, 226; *see also* <u>Califano v. Sanders</u>, 430 U.S. 99, 107-09 (1977).  This determination is not the subject of review in this case.  (DIB and SSI applications were also filed in 2010 and denied in 2012.  Tr. 111, 226-27.)

3. The claimant has the following severe impairments: status post preexisting C5-C6 fusion for multilevel degenerative disc disease, lumbar spine degenerative disc changes, and more recent loss of vision in the oculus sinister (left eye) [*see infra* at 18-19, n.15]. Tr. 35. The ALJ noted that Plaintiff had been evaluated and treated for hypertension that "was being managed medically, and should be amenable to proper control by adherence to recommended medical management and medication compliance, as well as the recommended weight loss and exercise. Furthermore, no aggressive treatment was recommended or anticipated for this condition." *Id.* Plaintiff's impairment of hypertension was considered non-severe. *Id.* The ALJ considered Plaintiff's allegation of headaches but, based on unremarkable results from an MRI of the brain taken in 2010 and that he had not received treatment, determined the headaches were not severe. *Id.* The ALJ also considered Plaintiff's history of obesity pursuant to Social Security Ruling 02-01p and determined it was not severe.[4] *Id.* The ALJ further considered Plaintiff's testimony that he had depression and anxiety, although noting that mental status examinations were consistently normal and that he had received minimal treatment and, therefore, these conditions were not severe. *Id.* The ALJ noted that Plaintiff refused to do any follow-up with a psychiatric specialist and, in that regard, determined Plaintiff had *no* restriction in activities of daily living, *mild* difficulties in maintaining social functioning, *mild* difficulties in maintaining concentration, persistence, or pace, and *no* episodes of decompensation, each of extended duration. Tr. 35-36.

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1. Tr. 36. The ALJ noted that "no treating source mentioned findings equivalent in severity to any such listing." Tr. 36.

5. The claimant has the residual functional capacity [RFC] to perform light work as defined in 20 CFR 404.1567(b) and 416.965(b),

---

[4] *See* SSR 02-01p, 2002 SSR LEXIS 1 (Sept. 12, 2002). The ALJ noted Plaintiff's body mass index (BMI) of 33.7, *see* Tr. 441 (as of July 31, 2015). Tr. 35.

except that he must avoid extreme industrial vibrations.  The claimant cannot operate dangerous machinery or tools, and never drive motorized vehicles as part of work activities as depth perception is limited to occasional with both eyes.  Finally, he must avoid concentrated exposure to direct sunlight.  *Id*.

6. The claimant is unable to perform any past relevant work, which included surveyor, classified as medium exertional level, semi-skilled work, with an SVP of 4; carpenter, classified as medium exertional level, unskilled work, with an SVP of 7; and concrete finisher, classified as heavy exertional level, unskilled work, with and SVP of 7.  Each job was compared to jobs included in the Dictionary of Occupational Titles (DOT).  Tr. 39, 88-89.

7. The claimant was 42 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date.  Tr. 39.  The claimant has at least a high school education and is able to communicate in English.  Tr. 40.  Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules (the Grids) as a framework supports a finding that the claimant is not disabled, whether or not the claimant has transferable job skills.  *Id*.

8. At step five of the sequential evaluation process, the ALJ, relying on the testimony of a vocational expert, determined that Plaintiff could perform several representative jobs including ticket seller, cashier II, and bench assembler, all considered light exertion level, unskilled work, with an SVP of 2.[5]  Tr. 40, 89-90.  The vocational

---

[5] "Unskilled work is work which needs little or no judgment to do simple duties that can be learned on the job in a short period of time."  20 C.F.R. § 404.1568(a).  A Specific Vocational Preparation (SVP) of 1 means "short demonstration only."  Dictionary of Occupational Titles (DOT) (4th ed., rev. 1991), Appendix C: Components of the Definition Trailer, § II, SVP.  An SVP of 2 means "[a]nything beyond short demonstration up to and including 1 month."  *Id.*  "[SVP] is defined as the amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation."  *Id.*  Unskilled work corresponds to an SVP of 1-2 whereas semi-skilled work corresponds to an SVP of 3-4.  Social Security Ruling (SSR) 00-4p, 2000 SSR LEXIS 8, at *8 (Dec. 4, 2000).  In part, "[l]ight work involves lifting no more than 20 pounds at a time with frequent lifting or carrying objects weighing up to 10 pounds."  20

expert opined that the hypothetical individual could still perform these representative jobs even if limited to understanding and carrying out simple, routine, repetitive procedures and tasks. Tr. 90.  On the other hand, the vocational expert opined that if the hypothetical individual would be off task for 20% of the time, "it would completely erode the occupational labor base for positions" previously identified."  *Id.*  Similarly, if the hypothetical individual were limited to the use of the upper extremities only occasionally with a sit/stand option and limited to sedentary work, those limitations would also completely erode and eliminate jobs in the national economy.  Tr. 90-91.  In the decision, the ALJ rejected the latter hypotheticals posed by Plaintiff's counsel "as the objective evidence of record does not support them."  Tr. 41.

9. The claimant has not been under a disability, as defined in the Social Security Act, from December 29, 2013, to the date of the ALJ's decision.  *Id.*

## III.  Legal Standards Guiding Judicial Review

This Court must determine whether the Commissioner's decision is

supported by substantial evidence in the record and premised upon correct

legal principles.  42 U.S.C. § 405(g); <u>Chester v. Bowen</u>, 792 F.2d 129, 131

(11th Cir. 1986).  "Substantial evidence is more than a scintilla, but less

than a preponderance.  It is such relevant evidence as a reasonable person

would accept as adequate to support a conclusion."  <u>Bloodsworth v.

Heckler</u>, 703 F.2d 1233, 1239 (11th Cir. 1983) (citations omitted); *accord*

---

C.F.R. § 404.1567(b).  "Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledges, and small tools."  20 C.F.R. § 404.1567(a).  "Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met."  *Id.*

Moore v. Barnhart, 405 F.3d at 1211. "The Commissioner's factual findings

are conclusive if supported by substantial evidence." Wilson v. Barnhart,

284 F.3d 1219, 1221 (11th Cir. 2002) (citations omitted).[6]

"In making an initial determination of disability, the examiner must

consider four factors: '(1) objecve medical facts or clinical findings; (2)

diagnosis of examining physicians; (3) subjective evidence of pain and

disability as testified to by the claimant and corroborated by [other

observers, including family members], and (4) the claimant's age,

education, and work history.'" Bloodsworth, 703 F.2d at 1240 (citations

omitted). A disability is defined as a physical or mental impairment of such

severity that the claimant is not only unable to do past relevant work, "but

cannot, considering his age, education, and work experience, engage in

any other kind of substantial gainful work which exists in the national

economy." 42 U.S.C. § 423(d)(2)(A). A disability is an "inability to engage

---

[6] "If the Commissioner's decision is supported by substantial evidence we must affirm, even if the proof preponderates against it." Phillips v. Barnhart, 357 F.3d 1232, 1240, n.8 (11th Cir. 2004) (citations omitted). "A 'substantial evidence' standard, however, does not permit a court to uphold the Secretary's decision by referring only to those parts of the record which support the ALJ. A reviewing court must view the entire record and take account of evidence in the record which detracts from the evidence relied on by the ALJ." Tieniber v. Heckler, 720 F.2d 1251, 1253 (11th Cir. 1983). "Unless the Secretary has analyzed all evidence and has sufficiently explained the weight he has given to obviously probative exhibits, to say that his decision is supported by substantial evidence approaches an abdication of the court's 'duty to scrutinize the record as a whole to determine whether the conclusions reached are rational.'" Cowart v. Schweiker, 662 F.2d 731, 735 (11th Cir. 1981) (citations omitted).

in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *see* 20 C.F.R. §§ 404.1505(a), 404.1509 (duration requirement).[7]

Both the "impairment" and the "inability" must be expected to last not less than 12 months. Barnhart v. Walton, 535 U.S. 212 (2002). In addition, an individual is entitled to DIB if he is under a disability prior to the expiration of his insured status. *See* 42 U.S.C. § 423(a)(1)(A); Moore v. Barnhart, 405 F.3d at 1211; Torres v. Sec'y of Health & Human Servs., 845 F.2d 1136, 1137-38 (1st Cir. 1988); Cruz Rivera v. Sec'y of Health & Human Servs., 818 F.2d 96, 97 (1st Cir. 1986).

The Commissioner analyzes a claim in five steps. 20 C.F.R. § 404.1520(a)(4)(i)-(v).

1. Is the individual currently engaged in substantial gainful activity?

2. Does the individual have any severe impairments?

---

[7] The relevant DIB and SSI regulations are virtually identical. As a result, citations will be made to the DIB regulations found at 20 C.F.R. §§ 404.1500-404.1599, unless a SSI regulation provides otherwise. The parallel regulations are found at 20 C.F.R. §§ 416.900-416.999, corresponding to the last two digits of the DIB citations, e.g., 20 C.F.R. § 404.1563(c) corresponds to 20 C.F.R. § 416.963(c).

3. Does the individual have any severe impairments that meet or equal those listed in Appendix 1 of 20 C.F.R. Part 404, Subpart P?

4. Does the individual have the RFC to perform work despite limitations and are there any impairments which prevent past relevant work?[8]

5. Do the individual's impairments prevent other work?

A positive finding at step one or a negative finding at step two results in disapproval of the application for benefits. A positive finding at step three results in approval of the application for benefits. At step four, the claimant bears the burden of establishing a severe impairment that precludes the performance of past relevant work. Consideration is given to the assessment of the claimant's RFC and the claimant's past relevant work. If

---

[8] An RFC is the most a claimant can still do despite limitations. 20 C.F.R. § 404.1545(a)(1). It is an assessment based upon all of the relevant evidence including the claimant's description of her limitations, observations by treating and examining physicians or other persons, and medical records. *Id.* Although an ALJ considers medical source opinions, the responsibility for determining claimant's RFC lies with the ALJ. 20 C.F.R. § 404.1546(c); *see* SSR 96-5p, 1996 SSR LEXIS 2, at *12 (July 2, 1996) (rescinded eff. Mar. 27, 2017) ("The term "residual functional capacity assessment" describes an adjudicator's finding about the ability of an individual to perform work-related activities. The assessment is based upon consideration of all relevant evidence in the case record, including medical evidence and relevant nonmedical evidence, such as observations of lay witnesses of an individual's apparent symptomatology, an individual's own statement of what he or she is able or unable to do, and many other factors that could help the adjudicator determine the most reasonable findings in light of all the evidence."); *see also* Cooper v. Astrue, 373 F. App'x 961, 962 (11th Cir. 2010) (unpublished) (explaining claimant's RFC determination "is within the province of the ALJ, not a doctor"). The Court will apply the SSR in effect when the ALJ rendered the decision. *See generally* Bagliere v. Colvin, No. 1**:**16CV109, 2017 U.S. Dist. LEXIS 8779, at *10-18, (M.D. N.C. Jan. 23, 2017), *adopted*, 2017 U.S. Dist. LEXIS 51917 (M.D. N.C. Feb. 23, 2017).

the claimant can still do past relevant work, there will be a finding that the

claimant is not disabled.  If the claimant carries this burden, however, the

burden shifts to the Commissioner at step five to establish that despite the

claimant's impairments, the claimant is able to perform other work in the

national economy in light of the claimant's RFC, age, education, and work

experience.  Phillips, 357 F.3d at 1237; Jones v. Apfel, 190 F.3d 1224,

1229 (11th Cir. 1999); Chester, 792 F.2d at 131; MacGregor v. Bowen, 786

F.2d 1050, 1052 (11th Cir. 1986); 20 C.F.R. § 404.1520(a)(4)(v), (e) & (g).

An ALJ may make this determination either by applying the grids or by

obtaining the testimony of a vocational expert.  Phillips, 357 F.3d at 1239-

40; *see* 20 C.F.R. pt. 404, subpt. P, app. 2.  If the Commissioner carries

this burden, the claimant must prove that he or she cannot perform the

work suggested by the Commissioner.  Hale v. Bowen, 831 F.2d 1007,

1011 (11th Cir. 1987).

Plaintiff bears the burden of proving that he is disabled, and

consequently, is responsible for producing evidence in support of his claim.

*See* 20 C.F.R. § 404.1512(a); Moore v. Barnhart, 405 F.3d at 1211; Ellison

v. Barnhart, 355 F.3d 1272, 1276 (11th Cir. 2003).  On the other hand, the

ALJ has a basic obligation to develop a full and fair record and must

develop the medical record for the twelve months prior to the claimant's

filing of his application for disability benefits.  Ellison, 355 F.3d at 1276;

Brown v. Shalala, 44 F.3d 931, 934 (11th Cir. 1995); 20 C.F.R.

§ 404.1512(d).  A claimant must demonstrate that he or she was prejudiced

by the ALJ's failure to develop the record before a due process violation will

justify remand.  Graham v. Apfel, 129 F.3d 1420, 1423 (11th Cir. 1997).  In

making this determination, "[t]he court should be guided by whether the

record reveals evidentiary gaps which result in unfairness or 'clear

prejudice.'"  *Id.*  (citing Brown v. Shalala, 44 F.3d at 934-35).

Plaintiff bears the burden of proving that he is disabled, and

consequently, is responsible for producing evidence in support of his claim.

*See* 20 C.F.R. § 404.1512(a); Moore, 405 F.3d at 1211.

## IV.  Legal Analysis

### Substantial evidence supports the ALJ's evaluation of the medical evidence and the determination that Plaintiff is not disabled.[9]

A.

Plaintiff raises two main issues for the Court's consideration.  First, Plaintiff argues the ALJ, at step two of the sequential evaluation process, minimized Plaintiff's depression and that such a finding is not supported by the medical evidence.[10]  ECF No. 16 at 17-19.  Thereafter, Plaintiff

---

[9]  As noted by the Commissioner, ECF No. 17 at 4-8, Plaintiff spends much time discussing how Social Security cases are generally handled by the agency and the federal court system and about the definition of disability, the Medical-Vocational Guidelines, the ability to perform substantial gainful activity, and cultural norms of employers granting rest breaks to employees.  ECF No. 16 at 3-16.  Plaintiff does not argue the ALJ erred based on any of these issues.  As a result, although not overlooked, these statements are not helpful in resolving the main issue in this case that the ALJ erred in not ordering a consultative mental health examination of Plaintiff and erred at step two.  ECF No. 16 at 17-25.

[10]  Plaintiff also suggests the ALJ should have found Plaintiff had a severe impairment related to his mental health, including depression.  ECF No. 16 at 17-19.  At step two of the sequential evaluation process, the ALJ found Plaintiff had a severe impairment of more recent loss of vision in the oculus sinister (left eye), *see infra* at 18-19 n.15, and other impairments.  Tr. 35.  The ALJ is not required, however, to identify all the impairments that should be considered severe.  *See* Heatly v. Comm'r of Soc. Sec., 382 F. App'x 823, 825 (11th Cir. 2010) (unpublished); *see also* Mariarz v. Sec'y of Health & Human Servs., 837 F.2d 240, 244 (6th Cir. 1987).  Step two of the test "acts as a filter" in that the "finding of any severe impairment . . . is  enough to satisfy the requirement of step two" and allow the ALJ to proceed to step three.  Jamison v. Bowen, 814 F.2d 585, 588 (11th Cir. 1987.)  As a result, even if the ALJ should have determined that Plaintiff's depression was severe, any error was harmless because the ALJ determined that other impairments were severe, which allowed the ALJ to move on to step three.  *See* Diorio v. Heckler, 721 F.2d 726, 728 (11th Cir. 1983) (concluding that error was harmless where it did not impact result of the step being challenged); *see also* 20 C.F.R. § 404.1520(a)(4).

discusses some of the medical evidence, including the consultative examination by Eftim Adhami, M.D., that was discussed by the ALJ, which include issues related to Plaintiff's physical and mental condition.  ECF No. 16 at 19-23.  Plaintiff notes the record "shows a diagnosis of depression with significant symptoms" and, that "Plaintiff's mental health would significantly limit Plaintiff's mental abilities and, as a result, interfere with his ability to perform basic work activities.  See SSR 96-3p."  ECF No. 16 at 24.  Plaintiff concludes his argument that the ALJ erred by not fully and fairly developing the record "by not ordering a consultative mental health examination of Plaintiff."  ECF No. 16 at 24-25.

### B.

The ALJ referred to Plaintiff's original application materials and noted Plaintiff "alleged that he was unable to work due to lower back injury and carpal tunnel (Exhibit 2E)."  Tr. 37.  "Upon reconsideration, he additionally alleged injury to his eye, and alleged that he cannot enjoy games with grandkids, or do household and yard duties (Exhibit 8E)."  *Id.*  The ALJ noted that Plaintiff gave similar testimony at the March 1, 2016, hearing,

> but added that he cannot lift/carry more than fifty pounds, can walk up to one hundred feet, stand up to twenty minutes and sit up to thirty minutes.  He alleged constant pain that is radiating and has a shock like quality.  He stated that he has trouble rising from a chair, cannot sleep nor hold a pencil at times.  Finally, he stated he takes

medication for hypertension that gives him dry mouth, causes him to sleep a lot and is "zombie" like.

Tr. 37.

The ALJ continues to refer to Plaintiff's hearing testimony, infused

with a discussion of the medical evidence.

> The claimant's alleged onset date of disability is December 29, 2013. However, the claimant testified that in 2010, he received multiple injures whilst at work when a wall fell atop his head. Remote records support the claimant's allegations, and indeed, the claimant did receive injuries. For example, a magnetic resonance image (MRI) from 2010 showed multilevel degenerative cervical spondylosis, disc protrusion to the left C5-6 with slight left cord flattening, and facet changes noted (Exhibit 1F) [Tr. 315-16]. The claimant began an inconsistent treatment regime with Antonio Diselafani, M.D., on March 8, 2011. On September 12, 2011, the claimant underwent an anterior cervical diskectomy and fusion, with anterior plate stabilization (Exhibit 5F) [Tr. 361-65]. Post radiographic images (x-rays) indicated stable degenerative wedging of mild to moderate with normal alignment and narrowing of the unfused discs (Exhibit 5F/4). Less than two weeks later, the claimant had complained that "everything" was worse. However, upon examination, the claimant had normal upper extremity strength, normal gait, was nonataxic and was noted by Dr. Diselafani that he was moving his neck quite well while he was emoting (Exhibit 5F/3) [Tr. 359]. Due to the complaints, an additional MRI of the cervical spine was performed, which showed no acute fracture or dislocation, with only minor degenerative changes (Exhibit 5F/1) [Tr. 357-58]. On January 4, 2012, Dr. Diselafani had to discharge the claimant from his care due to his rude, aggressive and threatening manner. The claimant had complained that the surgery had been unsuccessful and his neck "hurt so bad he could hardly move." However, Dr. Diselafani did observe that despite his complaints, he was "shouting, gesticulating, and moving his arms, hands and neck quite well" (Exhibit 3F) [Tr. 349].

As he was discharged from Dr. Diselafani's care, he began
treatment on February 21, 2012 with Interventional Medical
Associates (IMA) (Exhibit 2F) [Tr. 328-31].[11]  He presented with
complaints of low back and neck pain. Physical examinations
showed some limitations with range of motion and pain (Exhibit 2F)
[*Id.*].  Regardless, the claimant only had five treatment sessions in
the entire year.  In addition, the claimant had admitted that the
combination of therapy with Robaxin had helped with pain and
spasms (Exhibit 2F/7).  Indeed, the claimant sought no further
treatment for his back from IMA or any other source since
September 12, 2012 until July 31, 2015, in which he once again
complained of back pain (Exhibit 7F/7).   Indeed, there was no
intervening event that would explain the claimant's alleged onset
date of disability, except that he testified this was around the time
his workers compensation ceased.  Even more telling is that from
September 2012, office notes reflect numerous occasions on which
the claimant did not specify any particular complaint, which
contrasts with the current claim of ongoing, disabling symptoms
since the alleged onset date.  For example, examinations revealed a
normal range of motion, no tenderness, no edema, no back pain
and arthralgias, a supple neck, and it was noted while lying in bed,
he was in no acute distress and pleasant (Exhibits 6F and 8F).
Although, recent treatment records from 2015 showed some
limited flexion, musculoskeletal findings were normal, and balance
and gait were normal.  Additionally, the claimant had a tandem gait,
tandem heel and toe walking without pain, no pain on palpation to
the spine, no muscle spasms and a normal motor strength of 5/5 in
all four limbs (Exhibit 7F).  Moreover, the claimant admitted that he
had no difficulty with activities of daily living, such as feeding
himself, dressing, washing and doing his own shopping (Exhibit
7F/9).  The remote evidentiary record shows that prior to the alleged
onset date of disability the claimant had a significant injury, and
indeed had aggressive treatment (Exhibits 1F, 2F and 5F).
However, the claimant ceased treatment for his back for a number
of years suggesting he had improvement.  In addition, when he

---

[11]  Throughout Plaintiff's examination and treatment at IMA, Plaintiff's mental
status exams reflect that Plaintiff is alert, oriented, stable affect, and "pain behavior not
exhibited."  *See, e.g.*, Tr. 329, 333, 336, 339, 342; *see also* Tr. 372 (July 20, 2014,
normal mood, affect, and judgment, at Memorial Regional Hospital (MRH)-Plaintiff
examined and treated (surgery) for left eye incident).

> returned to treatment, findings were essentially normal.  This
> suggests that the claimant is not as limited as alleged, and he is
> able to perform work duties consistent with the residual functional
> capacity detailed above.

Tr. 37-38.

On March 22, 2014, Plaintiff was examined by State agency

consultant examiner, Dr. Adhami.[12]  Tr. 37, 351-56.

> Dr. Adhami noted that the claimant was extremely uncooperative in
> this examination.  He would not give a complete history, and he
> refused to perform the majority of tests.  Regardless, Dr. Adhami
> noted, *mostly from visual observations that were indirect,* the
> following: the claimant's muscle strength was 5/5 in all muscles, his
> walk was normal, he was able to argue for over an hour without
> getting tired, and could tie his shoes and move his arms.  In
> addition, visual acuity without lenses was 10/10 on the left eye and
> 10/10 on the right, and eye movements were normal bilaterally
> [*see infra* at 18-19, n.15].  Moreover, the claimant was able to
> stand and walk around the office for over an hour.  Dr. Adhami
> opined that from what he was able to observe, the claimant has no
> restrictions with walking and standing, and his neck seemed mobile
> in all direction (Exhibit 4F) [Tr. 354-56].  Although the claimant was
> uncooperative, Dr. Adhami is a specialist who observed the
> claimant and his opinion is consistent with the evidentiary record as
> a whole since the alleged onset date of disability.  As such, the
> undersigned assigns some weight to Dr. Adhami's opinion.

---

[12]  Although not given the same controlling weight or deference as the opinion of treating physicians, the findings of a State agency medical consultant regarding the nature and severity of a claimant's impairments must be treated as expert opinion at the ALJ and Appeals Council levels of administrative review.  *See* SSR 96-6p, 1996 SSR LEXIS 3, at *4 (July 2, 1996) (rescinded and replaced by SSR 17-2p eff. Mar. 27, 2017). The findings of a State agency medical consultant may provide additional evidence to support the ALJ's findings.  *See* Jones v. Bowen, 810 F.2d 1001, 1005 (11th Cir. 1986).

Tr. 38.[13]

The ALJ then noted that "the reports regarding activities of daily living are also inherently contradictory."[14]  Tr. 38.

> The claimant stated that he has no problems with personal care, and that he is able to do his own shopping (Exhibit 7F).  In addition, he testified that he had injured his eye when he was working for his aunt, and was hammering a nail from cement.  Some of the physical abilities required in order to perform these endeavors are suggestive of the same type of activities necessary for obtaining and maintaining employment.  The claimant's ability to participate in such activities is not consistent with his allegations of disabling functional limitations.

*Id.*[15]  The ALJ further noted that in terms of the physical impairments in the record, there were no opinions from treating or examining physicians

---

[13]  Although Dr. Adhami noted Plaintiff was uncooperative throughout the examination, he had normal range of motion (ROM) in all areas.  Tr. 351-53.  For example, Plaintiff refused a spine examination, but Dr. Adhami noted that his "range seemed preserved during tying shoes and going from sitting to standing; did not accept to go to the exam table for specific testing."  Tr. 355.  Dr. Adhami's mental observations included: "patient's mental status is normal in mood, judgment, and expression; understands questions refused to answer; Attitude and cooperation: total lack of cooperation."  Tr. 355.

[14]  The ALJ may consider a claimant's daily activities when evaluating subjective complaints of disabling pain and other symptoms.  Macia v. Bowen, 829 F.2d 1009, 1012 (11th Cir. 1987); 20 C.F.R. § 404.1529(c)(3)(i).  *But see* Lewis v. Callahan, 125 F.3d at 1441 ("participation in everyday activities of short duration, such as housework or fishing" does not disqualify a claimant from disability).  Although the ALJ did not expressly refer to the three-part pain standard set forth in Wilson v. Barnhart, 284 F.3d 1219, 1225 (11th Cir. 2002), the ALJ's findings, discussion, and citation to 20 C.F.R. § 404.1529, Tr. 36, indicate that the pain standard was applied.  Wilson, 284 F.3d at 1226.

[15]  On November 6, 2015, Plaintiff was examined at Gulf Coast Optometry in St. Petersburg, Florida.  Tr. 405 (Exhibit 8F).  Aside from noting high blood pressure under cardiovascular, a review of systems was negative.  Tr. 406.  His mood and affect

indicating that the Plaintiff is disabled or has limitations greater than the RFC.  "Given the claimant's allegations of totally disabling symptoms, one might expect to see some indication in the treatment records of restrictions placed on the claimant by the treating doctor.  Yet a review of the record reveals no restrictions recommended by the treating doctor."[16]  Tr. 38-39.

---

were appropriate.  *Id.*  Under "visual acuities," it is noted 20/400 for the right eye (OD) and "LP" for the left eye (OS).  Tr. 407; *see* Tr. 413 (Oct. 27, 2015, examination – "BVA was 20/400 OD and LP OS.")  (Plaintiff testified while helping her aunt, he hit a nail on the head with a hammer and the nail broke off and struck him in the left eye causing blindness.  He wears glasses for his right eye only.  Tr. 66, 68-71; *see* Tr. 370-91 (July 20-22, 2014, examination and treatment (surgery) at MRH for left eye injury).  Notwithstanding these results, other test results for his eyes were generally normal, although he had a laceration of the cornea in his left eye (OS (ocular sinister)) and LP (light perception) in the same eye.  Tr. 407-09.  Under "Diagnosis and Plan," it is noted that Plaintiff had myopia (nearsightedness) of the right eye (OD), but examination revealed normal health eyes with visual acuity at 20-20 in each eye.  Tr. 409.  He had presbyopia of the right eye (OD), but examination revealed normal health eyes with visual acuity at 20-20 in each eye.  *Id.*  New glasses were prescribed to correct visual acuity and function.  Yearly exams were recommended.  Tr. 409; *see* Tr. 410-13 (Oct. 10, 2015, examination (Exhibit 9F)).  The ALJ identified his loss of vision in his left eye as a severe impairment, Tr. 35, and included a limitation in the RFC determination.  Tr. 36.  In the memorandum submitted to the ALJ on February 23, 2016, Plaintiff's counsel stated: "Ex 9F Corrected Gulf Coast Optometry Examination Report will be submitted when received, the Diagnosis and Plan *were not correct* on Ex 8F, Doctor will correct and resend."  Tr. 313 (emphasis added).  It does not appear that a corrected document is in the record.  Counsel did not mention this issue during the hearing.  *See generally* Tr. 62-63, 91-92.  Based on Plaintiff's testimony and representation of counsel, the "Diagnosis and Plan," Tr. 409, misstates the status of Plaintiff's left eye as suggested by counsel.  As an aside, on March 22, 2014, and *prior* to Plaintiff's left eye surgery on July 20, 2014, Tr. 381-82, Dr. Adhami stated that Plaintiff's visual acuity without lenses is 10/10 on the left and right eyes and eye movements were normal bilaterally.  Tr. 354; *see* Tr. 38.

[16]  The ALJ considered but gave no weight to the opinions rendered by the State agency medical consultants who opined that Plaintiff had no severe impairments.  Tr. 39; *see* Tr. 110-23 (Sept. 16, 2014, on Reconsideration).

The ALJ also considered Plaintiff's "general appearance and demeanor while testifying at the hearing, which was approximately forty-five minutes in duration."[17]  Tr. 39.

> As to the claimant's appearance at hearing, he looked his stated age, was appropriately dressed, and had good personal hygiene and grooming.  The claimant stated he could sit for only thirty minutes, but remained seated during the entirety of the hearing without significant difficulty observed from a lay perspective.  The claimant used no assistive devices, and his gait was normal, as well as his posture and motor behavior.  The claimant had appropriate contact, and at the end of the hearing, he stood up, and walked out of the hearing room with a normal gait, again from a lay perspective.
>
> As to the claimant's demeanor, he was cooperative and responsive to questions.  The claimant was alert, and aware of what went on at the hearing.  The claimant paid good attention, was well focused and understood the questions appropriately giving adequate and simple answers.  The claimant's manner of relating, social skills and overall presentation were adequate.  The claimant's speech was clear, intelligible, logical, coherent, goal directed, and kept the trend of thought.

*Id*.  The ALJ concluded the RFC determination noting that Plaintiff's "alleged symptoms and restrictions are not supported by the medical signs and diagnostic findings to the total level of disability alleged."  *Id*.

As noted above, the ALJ considered the medical evidence including Plaintiff's treatment records in 2015.  Tr.  38.  Plaintiff established care as a

---

[17]  Effective March 28, 2016, the Social Security Administration adopted SSR 16-3p, 2016 SSR LEXIS 4, at *26-28 (Mar. 28, 2016), superseding SSR 96-7p, pertaining to assessing the claimant's credibility.

new patient with Community on July 31, 2015. Tr. 398. He was examined by Amy Brown, ARNP. *Id*. His chief complaint included headaches and a request to check his eyes. *Id*. In part, it is stated that "[a]ctivities of daily living are extremely difficult for the patient due to the depression symptoms" outlined in the evaluation. *Id*. His general appearance was characterized as awake, alert, well developed, well nourished, and in no acute distress. Tr. 401. His level of consciousness was normal and his balance, gait, and stance were normal. *Id*. His mood was euthymic and affect normal. *Id*. Extraocular movements were normal for the right eye and "PERL L eye pupil no reactive." *Id*.; *see* Tr. 395 (Aug. 31, 2015, extraocular movements-normal). He had a normal gait and tandem, heal, and toe walking was without pain. Tr. 402. Regarding his back, he had limited flexion (45 degrees), extension (10 degrees), rotation (30 degrees) and lateral flexion (30 degrees) of the spine with pain throughout. *Id*. There was no pain on palpation "of the C, T spine," but "[p]ain with palpation to L spine." There was no pain over C, T paraspinal muscles, but pain over bilateral L paraspinal muscles; muscles were tight but no spasms noted. *Id*. Motor strength was normal bulk and tone in all four extremities; power is 5/5 in all four limbs; 2+ symmetric DTRs - patellar and Achilles. *Id*. He received an assessment, therapy, and counseling/education and

received a plan for essential (primary) hypertension with medication and for low back pain, three medications.  Tr. 402-03.  In part, he received a referral to mental health worker/professional and a follow-up in one month.  Tr. 403.

Plaintiff followed up with Community on August 31, 2015.  Tr. 392-96.  His chief complaint was a follow-up for back pain.  Tr. 392.  Diagnoses included no hypertension, hyperlipidemia, diabetes mellitus, psychiatric disorders.  Tr. 323.  A review of systems indicated relatively normal findings except musculoskeletal symptoms without explanation.  Tr. 394.  There are no psychological symptoms and no feelings of hopelessness.  *Id.*  Overall physical findings were normal for the musculoskeletal system, his level of consciousness, balance, gait, and stance were normal and his mood was euthymic and affect normal.  Tr. 395.  The assessment included tobacco use, benign essential hypertension, and chronic pain.  *Id.*  Therapy notes included medication instruction; counseling/education notes discuss abstinence from smoking, losing weight, nutritional needs, etc.  *Id.*

After the March 1, 2016, hearing, *see* Tr. 91-92, Plaintiff was again examined at Community by Nicole Millar, LCSW.  Tr. 414-15.  (No RFC form was provided by Community.  *See* Tr. 91.)  The encounter is noted as: "Behavioral Health New."  Tr. 414.  He and his fiancée met with a therapist.

Tr. 415.  Active problems included depression among others.  Tr. 414.

Physical findings (psychiatric) included thought content – no suicidal

ideation, no suicidal plans, no suicidal deviations, no homicidal plans, and

no homicidal intent.  *Id*.  The assessment was depression.  Tr. 415.

Plaintiff advised that he was taking amitriptyline that was prescribed by

Nurse Brown.  *Id*.  He did not wish to be referred to psychiatry at this time,

but was agreeable to trying ongoing therapy.  *Id*.  The plan included "major

depressive disorder, single episode, unspecified."  *Id*.  His goals of care

included that he reported "that he would like to set an initial goal of

increasing interest/participation in enjoyable activities, and will work to

quantify goal in next session."  *Id*.  He was instructed to stay in touch with

Nurse Brown regarding medications "and will begin to attend ongoing

therapy."  *Id*.  The ALJ referred to this report, Exhibit 10F, at step three of

the sequential evaluation process noting that Plaintiff

> testified that he had depression and anxiety.  However, mental status
> examinations were consistently normal (Exhibits 2F, 7F and 10F).
> Although the claimant has received minimal treatment for the alleged
> psychological conditions, the undersigned finds that these conditions
> do not pose any significant limitations on the claimant's ability to
> perform work-related functions and are therefore "not severe" within
> the meaning of the Social Security Act and regulations.  Indeed, the
> claimant refused to do any follow up with a psychiatric specialist
> (Exhibit 10F) [Tr. 415-"Pt does not wish to be referred to psychiatry at
> this time, but is agreeable to trying ongoing therapy.")].

Tr. 35; *see supra* at 16, n.11 & 18, n.13.  Thereafter, the ALJ discussed the degree of limitation Plaintiff in areas of functioning and determined that he had *no* restriction in activities of daily living, *mild* difficulties in maintaining social functioning, *mild* difficulties in maintaining concentration, persistence, or pace, and *no* episodes of decompensation, each of extended duration.  Tr. 35-36.  These minimal findings equate to a finding that Plaintiff has a non-severe mental impairment.  *See* 20 C.F.R. § 404.1520a(d)(1); *see also* Stone v. Comm'r of Soc. Sec., F. App'x 505, 512 (11th Cir. 2014) (unpublished).

    As noted therein, Plaintiff's mental status examinations were consistently normal.  Tr. 35.  Plaintiff refused to do any follow-up with a psychiatric specialist as he did not feel a psychiatric follow-up was necessary, which undercuts Plaintiff's argument that he had a severe mental impairment.  Tr. 35, 415.  His most recent exam results at Community do not help his cause.  Tr. 414-15.

    Lastly, Plaintiff argues that the ALJ erred because he did not fully and fairly develop the record regarding his mental issues when the ALJ did not order a mental consultative examination.  ECF No. 16 at 24-25.  Although the ALJ has the obligation to "develop a full and fair record," the ALJ's obligation is not to act as counsel for Plaintiff.  Graham v. Apfel, 129 F.3d at

1422.  In examining whether the ALJ fully developed the record, a court looks to see if the record contains evidentiary gaps that result in unfairness or clear prejudice to the claimant.  Brown v. Shalala, 44 F.3d at 935.  If the record contains sufficient evidence for the ALJ to make an informed decision, the ALJ will not err if a consultative examination is not ordered.  Ingram v. Comm'r of Soc. Sec., 496 F.3d 1253, 1269 (11th Cir. 2007); see 20 C.F.R. § 404.1519a.  A consultative examination need not be obtained to establish absolute certainty regarding a claimant's condition, as the Social Security Act requires only substantial evidence to support an ALJ's findings.  See Holladay v. Bowen, 848 F.2d 1206, 1210 (11th Cir. 1988).

Plaintiff contends the ALJ did not fully and fairly develop the record because he exhibited "overtly abnormal behavior" at an examination with Dr. Adhami, and he had diagnoses of depression with significant symptoms.  ECF No. 16 at 24.  The record contains information from health care providers such as Community, detailing examination and some treatment for, for example, Plaintiff's reports of depression and he received treatment for this diagnosis.  Tr. 392-404, 414-15.  Despite Plaintiff's self-reports of issues with depression, Plaintiff was consistently awake, alert, and in no acute distress during examinations.  He was consistently found to have normal mood and affect.  He reported feeding himself with no

difficulty, having no difficulty dressing, having no difficulty washing himself, and having the ability to do his own shopping.  Tr. 393-95, 400-01, 414.  He reported never needing help reading instructions from a doctor or pharmacist.  Tr. 393, 400, 414.  At an examination in August 2015, Plaintiff's mood was euthymic and affect normal, Tr. 394-95, and in March 2016, he did not wish to be referred to psychiatry at this time, but was agreeable to trying ongoing therapy, although the assessment noted "depression."  Tr. 415.  Substantial evidence supports the ALJ's decision and Plaintiff has not shown any evidentiary gaps including any potential gap that resulted in prejudice.

Further, substantial evidence supports the weight ("some weight") the ALJ gave to Dr. Adhami even though, as a one-time examiner, the doctor was not entitled to any special weight.  *See generally* Crawford v. Comm'r of Soc. Sec., 363 F.3d 1155, 1160 (11th Cir. 2004).

Substantial evidence also supports the ALJ's consideration of the medical evidence of record.  No treating physician opined that Plaintiff's impairments are of such severity as to preclude him from working in any capacity.  On the other hand, Dr. Adhami's consultative examination, and other considered evidence, support the ALJ's finding Plaintiff could perform light work with limitations.  Tr. 36.

Plaintiff bears the burden of proving that he is disabled, and consequently, is responsible for producing evidence in support of his claim. *See* 20 C.F.R. § 404.1512(a); <u>Moore v. Barnhart</u>, 405 F.3d at 1211; <u>Ellison v. Barnhart</u>, 355 F.3d at 1276.  The Commissioner is charged with the duty to weigh the evidence, resolve material conflicts in testimony, and determine the case accordingly.  *See* <u>Watson v. Heckler</u>, 738 F.2d 1169, 1172 (11th Cir. 1984).  Even if this Court disagrees with the ALJ's resolution of the factual issues and would resolve the disputed factual issues differently, the decision must be affirmed where, as here, if supported by substantial evidence in the record as a whole.  *See* <u>Martin v Sullivan</u>, 894 F.2d 1520, 1529 (11th Cir. 1990).  Substantial evidence supports the ALJ's decision that Plaintiff was not disabled from December 29, 2013, through the date of the ALJ's decision, May 11, 2016.

## V.  Conclusion

Considering the record as a whole, the ALJ's findings are based upon substantial evidence in the record and the ALJ correctly applied the law. Accordingly, it is respectfully recommended that the decision of the Commissioner to deny Plaintiff's applications for Social Security benefits be

**AFFIRMED** and Judgment entered for Defendant.

**IN CHAMBERS** at Tallahassee, Florida, on March 21, 2018.

s/ Charles A. Stampelos
CHARLES A. STAMPELOS
UNITED STATES MAGISTRATE JUDGE

## NOTICE TO THE PARTIES

Within fourteen (14) days after being served with a copy of this Report and Recommendation, a party may serve and file specific written objections to these proposed findings and recommendations. Fed. R. Civ. P. 72(b)(2). A copy of the objections shall be served upon all other parties. A party may respond to another party's objections within fourteen (14) days after being served with a copy thereof. Fed. R. Civ. P. 72(b)(2). Any different deadline that may appear on the electronic docket is for the Court's internal use only and does not control. If a party fails to object to the magistrate judge's findings or recommendations as to any particular claim or issue contained in a Report and Recommendation, that party waives the right to challenge on appeal the district court's order based on the unobjected-to factual and legal conclusions. *See* 11th Cir. R. 3-1; 28 U.S.C. § 636.